Chapter 6

# The Value of Household Services

§600   In General
§610   What Are Household Services?
§620   Years of Healthy Life and Full Function Life
§630   Adjusting Household Service Values
§640   Companionship, Advice, and Counsel Services
§650   Measuring the Loss

§600   In General
§610   What Are Household Services?
    §611   Measuring the Amount of Services Lost
    §612   Ask About Unusual Services
§620   Years of Healthy Life and Full Function Life
    Table 23:  Healthy and Full Function Life Expectancy
§630   Adjusting Household Service Values
    §631   Self Consumption of Household Services
    §632   Joint Family v. Individual Service Value
§640   Companionship, Advice, and Counsel Services
    Table 23A:  Hourly Median Wages of Companionship Related Occupations
    Table 23B:  Hourly Median Wages of Advice Related Occupations
    Table 23C:  Suggested Hourly Quantities of Services
    Table 23D:  Estimated and Suggested Annual Values of Services
§650   Measuring the Loss
    §651   The Four General Approaches to Measuring Household Production of Services
    §652   The Dollar Value of a Day
    Table 24:  Dollar Value Per Day
    §653   Hours of Household Work Based on Marital Status
    Table 24A:  Household Work by Marital Status

## §600     IN GENERAL

Services performed in the home for the house and family have a dollar value that can be measured in one of two ways. First, if a husband or wife does not work outside the home, the value could be measured using the opportunity cost. This is the amount of earnings foregone by the husband or wife for voluntarily remaining at home rather than



taking an outside job. While it has intuitive appeal, it is difficult to use because of the difficulty in determining just what jobs and salaries have been foregone. Alternatively, the economist can use the market replacement cost approach wherein the value of services is measured by determining what it would cost to hire an outsider to perform all the household services.

## §610    WHAT ARE HOUSEHOLD SERVICES?

In most families, the husband spends more time away from the home than the wife, and the time and value of his services is usually less than hers. The husband most likely is involved in home jobs such as cutting the grass, washing cars, making household repairs, teaching children about sports activities, managing finances, making investments, moving furniture, shoveling snow, etc. The wife normally is responsible for cooking, washing clothes, grooming children, providing guidance and counsel to children, washing windows, general housekeeping, serving as chauffeur, nursing illnesses, etc. In recent years, as more and more women participate in the workplace, the distinction as to who does which of the services has become blurred. All of these items fall into the services category of jobs, but it would be extremely difficult to find one person who could be hired to perform all of these services. Consequently, it is necessary to make some general estimate of the time consumed in each job, and then to price that job if it were to be hired out.

### §611    Measuring the Amount of Services Lost

In a death case, all services are lost, but this is not always true in an injury case. When a member can no longer perform all services formerly done because of the injury, it may be possible to get a list of the things that can no longer be done. This, too, can be difficult as often the husband does not know of all the things the wife did before her death or injury because he is not constantly with her monitoring her activities. The same is true when the husband's services are reduced.

There is no foolproof way to arrive at an accurate value of lost services, but the job is far from hopeless. Begin by considering, or asking the family members to consider whether the services formerly performed were, in their opinion, what would be performed in an average family. If so, then ask to what degree the performance of those services has been lost. For example, in a death case, 100% of the services have been lost. Then, in an injury case, use 100% as the figure representing all services formerly done by the injured person and ask the family and the injured person what percent of the services done prior to the injury can no longer be done. That is, can the injured person no longer perform 60% of what could be done before, 80%, 25%, or some other amount? Granted, this is an estimate on the part of the family, but it is better than a guess, or an arbitrary value assigned by the economist and it gives your economist a basis for his estimate. Another approach would be to have the family or surviving spouse create a list of every job done by the deceased or injured spouse. Then have them itemize those that can no longer be done. The full list would comprise 100% of what was formerly done and the revised list would represent what can no longer be done, and a cost estimate can then be made for those services no longer performed. The cost to replace those services in the local market can be a proxy for the value of the services. It would be helpful if the family could estimate the amount of time spent on each service per day or week.

### §612    Ask About Unusual Services

In some families, parents have unusual talents that permit them to perform services beyond those of a typical family. For example, if the wife is an accomplished seamstress, she probably saves the family considerable amounts of money by making clothes, tablecloths, drapes, and other items. The husband may be a carpenter, plumber, or electrician who can make or repair things around the home that the average husband would have to pay to have done. In cases such as these, it seems justifiable to assume that the value of the services by the skilled member is greater than the average and a claim for a higher loss to the family can be made.

## §620    YEARS OF HEALTHY LIFE AND FULL FUNCTION LIFE

As a person ages, it is quite common to find that he or she can no longer do the same amount of work as he or she could in younger, healthier years. This seems true for work outside the home as well as for work inside the home and for the family. For many years, economists calculated the value of lost household services to the end of life expectancy, but there were always questions about the validity of this practice. Now, many economists have begun to either make a linear reduction for, say, the last 10 years of life expectancy or have completely eliminated a few of the last years. Until recently, economists did not have the data readily available with which to make an adjustment

other than arbitrary (which was still better than no adjustment). Now, Expectancy Data, an economic demographic publisher in Shawnee Mission, Kansas, (877) 326-3282, has combined data from the Department of Health and Human Services (DHHS) into a format the economist can use to determine how many years of "healthy life function" a person has remaining, given his or her sex, age, and race. The study is published at irregular intervals and is titled *Healthy Life Expectancy*. DHHS says that healthy life occurs when a living person perceives that his or her health is excellent and his or her activities are not limited in any way.

Rarely does a person go from a healthy life one day to an unhealthy life the next, absent some catastrophic event. But the actual onset and rate of decline is difficult to measure. The authors of *Healthy Life Expectancy* have analyzed the data from DHHS and have developed a table similar to a life expectancy table, except that it measures the years of healthy life and full function life remaining rather than years to end of life expectancy. We have used those two tables to create a different table that lists by age, sex, and race the difference in years between full life and healthy life expectancy. Table 23 shows those differences.

Expectancy Data offers an alternative measure called Full Function Life Expectancy (FFLE). These expectancies fall somewhere between Life Expectancy and Healthy Life Expectancy (HLE). The reasoning is that it is not always necessary for a person to curtail activities due to a medical problem that places him or her in the less than healthy category. For instance, a diabetic may live to a normal life expectancy and remain fully functional for many years. For this reason, some economists will prefer to use FFLE rather than HLE to determine the end of the ability of a person to perform household services. Table 23 contains the estimates for FFLE.

## Table 23: Healthy and Full Function Life Expectancy

**Please see the Tables folder on the CD-ROM for this image.**

## §630    ADJUSTING HOUSEHOLD SERVICE VALUES

The previous sections suggested that the most understandable method of presenting household service values to a jury may be to use the weekly hours and average market cost for services. For years, however, economists have been wrestling with three logical but nagging problems:
- will a person perform services right to the end of life expectancy,
- does a person consume a portion of the services he or she generates, and
- should joint consumption be used in the evaluation?

While many commentators have addressed these issues in the professional journals and at conventions, no definitive study has yet surfaced. The National Association of Forensic Economists (NAFE) has listed this topic as one most in need of research. For now, economists must use logic and common sense in making a calculation of this type of loss. In previous editions of this guide, these difficult topics have been omitted in the hope that a generally acceptable answer would appear, but that has not yet happened. This author has no unique solutions to these problems, but can no longer avoid offering suggestions that represent a departure from the methods previously recommended in this guide. Hopefully, the following discussion will generate critiques from other economists, which are usually followed by further research and culminate in a consensus opinion.

This is one area in which the attorney, regardless of whether he or she represents the plaintiff or the defendant, should not be overly concerned if the economist makes adjustments to fine tune the evaluation which depart from what was done in the past. Remember, the object is to properly compensate the plaintiff without unfairly penalizing the defendant. Forensic economics is a dynamic topic that should not be allowed to stagnate when changes can be made that improve the evaluation process. The sections that follow suggest methods for handling the problems mentioned above.

### §631    Self Consumption of Household Services

One issue that continues to intrigue forensic economists is the amount of household services performed by the decedent that were for his/her benefit only and were not a loss to the family. This is analogous to the deduction of personal maintenance (consumption) from the income lost due to the death of a family member.

In the *Journal of Forensic Economics*, Vol. 6, No. 2, authors Robert Trout and Carroll Foster published a paper titled "Estimating a Decedent's Consumption in Wrongful Death Cases." In their introduction, they state that the "measurement of a decedent's consumption may be more complicated than has heretofore been recognized." They assert that many of the services performed benefited all family members, citing a clean house as an example of

something jointly consumed (enjoyed) by all family members. It is also noted that some of the services are individually consumed for the benefit of the person performing the service. Citing other studies, Trout and Foster found that some economists advocate that 50% of services are consumed for the benefit of only the person performing the service. Chapter 5 of this guide deals with the issue of personal consumption of income and cites to several studies from which the economist determines the percentage of income to deduct in a death case. Trout and Foster use several of these same studies and state that their practice is to "simply use the same proportion for income deductions and apply it to family uncompensated household services, since no better benchmark seems to exist." This would put the range of deduction within 20 to 40%.

For those economists who argue that no benchmark exists, one suggested method is to begin by assuming that 50% of household services are not divisible among individual household members, but go to the benefit of all when the household consists of more than one person. The remaining 50% could then be divided equally among the family members. In a four-person household, then, each person would personally consume 12.5% (50% divided by 4 persons). Should a parent die, then there could be a 12.5% reduction to determine the amount of services lost to the remaining three survivors. When the oldest child reaches age 18, then the deduction could be increased to 16.7% (50% divided by 3 persons) and increased further to 25% (50% divided by 2 persons) when the youngest child reaches age 18. Please note that this is not a method developed by using statistical data, but simply a suggestion that depends on making certain undocumented assumptions.

### §632    Joint Family v. Individual Service Value

The third problem has to do with whether the deduction should be made from the total value of services provided by the wife and husband combined, or only from the value of services performed by the deceased spouse. There has been some discussion in the literature and at conventions that when, for example, the wife dies, the husband loses some or all of the value of her services but, simultaneously, the amount of services he must perform are also reduced in the sense that he no longer must do things that benefited only his wife. For instance, he no longer has to dry her dishes after meals or pick up her dry cleaning. Others argue that only the value of the services performed for her husband by the deceased spouse, the wife in this example, should be subject to the consumption deduction. At the NAFE meeting mentioned previously, where the economists were asked to calculate the household service value for a deceased wife, none of them made a deduction from the husband's value.

While this is certainly not a scientific sampling of the methodology to which economists in general subscribe, it is at least an indication that, at present, the deduction should be made only from the value of the decedent's services.

In the interim, while awaiting further study, the economist has the option of making the deduction from either joint or individual service value. Perhaps a worthwhile compromise would be to calculate the loss of value both ways, explaining to the jury that they must decide which is the most logical method.

### §640    COMPANIONSHIP, ADVICE, AND COUNSEL SERVICES

*It has long been acknowledged by attorneys, judges, and economists that in a wrongful death action, two of the losses to survivors are the companionship and the advice provided by the decedent. Those have always been difficult items on which to place a dollar value and in the past had not been included in this guide. That void in this guide has now been filled. Frank D. Tinari, Ph.D., President, Tinari Economic Group and Professor Emeritus of Economics at Seton Hall University and Kristin Kucsma, M.A., Associate Economist, Tinari Economics Group have written an excellent explanation of this difficult subject. Going beyond an explanation, they have prepared four tables that give the reader a guide as to how a monetary value may be placed on companionship and advice. The remainder of this section and Tables 23A through 23D were written by them.*

In previous sections of this chapter, the scope of household services was restricted primarily to more-or-less physical type activities such as those described by King and Smith (King, Elizabeth M. and James P. Smith, *Computing Economic Loss in Cases of Wrongful Death,* Santa Monica, CA: Rand Institute, 1988) activities like "preparing meals, cleaning the house, laundry, shopping, home repairs, and childcare" (King and Smith, p. 60). Household activities that had served to benefit the decedent only (e.g., entertainment, hobbies, sports) or benefit the broader society (e.g., political activities) are not considered as part of household services. This narrow definition of household services, while it may be the "norm in litigation practice," excludes two important components of services that would have been provided by a deceased parent/spouse to *surviving family members*: companionship services, and advice, guidance, and counsel services. Typically ignored in descriptions and listings of household

services, these services *should* be included in order to obtain a more accurate and comprehensive measurement of the loss of nonmarket activities to surviving family members. But how can such services be measured?

### Measuring the Amount of Services Lost

In his 1988 publication, *Recovery for Wrongful Death and Injury, Economic Handbook* (3rd edition, NY: Lawyers Co-operative Publishing Company), Stuart Speiser argues that "economists cannot investigate values that lack a market equivalent." He goes on to emphasize that only those services that can be measured and expressed in money terms can and should be included in the calculation of the value of services. Speiser specifically identifies conjugal bliss (where compensable), companionship, and custodianship of hearth and home as items that illustrate losses of valuable benefits but that are not readily amenable to economic analysis and measurement. Interestingly, Speiser includes among those values that lack a market equivalent the role of a counselor even though a comparable market occupation, "teacher, psychotherapist," exists.

As it turns out, the two components of household services being discussed, i.e., companionship services, and advice, guidance, and counsel services, *are* amenable to economic analysis and *can* readily be assigned equivalent market occupations and corresponding wage rates. Moreover, they are sufficiently large in magnitude that their omission results in serious underestimation of the value of household services. [See Tinari, "Household Services: Toward a More Comprehensive View," *Journal of Forensic Economics,* 11 (03), 1998, pp. 253-265.]

### What Are Companionship Services?

Companionship is defined here simply as the presence of another person during one's daily activities. Such companionship provides a sense of security and reassurance that is decidedly absent when activities are undertaken alone. It is critical to the definition not to include consortium, intimate relations, love, and affection. Rather, companionship services are more akin to those provided by a "pal" or acquaintance that provides a reassuring presence such as when one goes shopping with another person and seeks the opinion of the other in making purchasing decisions, or when acquaintances attend a movie, play cards, or take a stroll together. In an important sense, therefore, the primary purpose of companionship is to relieve loneliness. Companionship services require the presence of another person but not any particular physical work activity or intimacy.

In the case of family members, the task is to separate companionship services from other more personal and intimate services provided to one another. This may be accomplished by ascertaining the hours that family members would have spent together in various activities that would have otherwise been done alone. So, if a couple went bowling together for two hours each week, or shared dinner one hour each evening, or went shopping together on the weekend, these would be the sort of companionship services that would be lost with the death of one of its members.

Household services studies and data sets generally do not include any sort of measure of companionship services. The Dollar Value of a Day (DVD) attempts to measure these services by estimating time spent with family while providing primary services such as inside housework, cooking, and cleaning. Companionship services in this case, however, are considered secondary services. As such, measures of these services will be under-represented. Thus, an explicit measure of companionship is necessary to ensure that economic damages are not understated. A detailed discussion of DVD can be found in §652.

### What Are Advice, Guidance, and Counsel Services?

The services of advice, guidance, and counsel may be defined as the provision of helpful opinion, advice and information to one's spouse, children, and elderly parents, as the need arises, in the areas of family problems, medical concerns, schooling, careers, finances, and personal relationships.

The critical question to answer is whether or not these services are omitted in oft-cited studies and data sets. The Panel Study of Income Dynamics national time-use surveys include tabulation of services such as helping/teaching children learn, fix, and make things, reading to children, conversing with children, and outdoor playing with children, (Leonesio, Michael V., "Recent Trends in Women's Use of Time and their Implications for Assessing the Replacement Cost of Household Services," *Journal of Forensic Economics,* 1(2), 1988, pp. 47-5) while the Gauger and Walker study at Cornell University included "childcare" services (Gauger, William H. and Kathryn E. Walker, *The Dollar Value of Household Work,* Ithaca, NY: Cornell University, 1980). Thus, it is clear that various forms of advice to *children* have been included in some studies. The inclusion of any sort of guidance or advice to *adult* family members, however, is noticeably absent from nearly all studies. Only the DVD makes mention of the provision of any sort of guidance or advice to *adult* family members and, as stated above, it treats these services as secondary services resulting in measures that are understated.

**Measurement Issues**

Advice and companionship services are generally lumped together with those services that are believed to be immeasurable because they have no close market proxies. Hauserman and Pethke point out that:

> If the homemaker is removed, then the continuity for the children created by her presence, the love and affection, the security, the companionship, etc., may also be removed. None of these services have purchasable market equivalents and are difficult to include in replacement-cost calculations. (Hauserman, Nancy R. and Carol Fethke, "Valuation of a Homemaker's Services," *The Trial Lawyer's Guide* (Illinois Bar Association), Vol. 22, No. 3, Fall 1978, pp. 249-66.)

The key consideration, therefore, is whether or not there exist markets that provide largely comparable services for a fee or wage. In at least one jurisdiction, the State of New Jersey, the court has recognized the measurability of such services. With respect to advice, guidance, and counsel, Chief Justice Robert Wilentz explained:

> ... it is the loss of that kind of guidance, advice and counsel which *all* of us need from time to time in particular situations, for specific purposes, perhaps as an aid in making a business decision, or a decision affecting our lives generally, or even advice and guidance needed to relieve us from unremitting depression. It must be the kind of advice, guidance or counsel that could be purchased from a business advisor, a therapist, or a trained counselor, for instance. That some of us obtain the same benefit without charge from spouses, friends or child does not strip it of pecuniary value. (Supreme Court of New Jersey, *Green v. Bittner*, 85 NJ 1, 1980, p. 14)

Similarly, companionship is distinguished from consortium in that people are able to hire paid "companions," usually practical nurses or paid companions from a nursing registry service for the purposes of having someone accompany them while shopping, help them obtain transportation, and generally be a companion to them. The basis for such a loss was described by Chief Justice Robert Wilentz as follows:

> Companionship, lost by death, to be compensable must be that which would have provided services substantially equivalent to those provided by the companions often hired today by the aged or infirm, or substantially equivalent to services provided by nurses or practical nurses. And its value must be confined to what the marketplace *would* pay a stranger with similar qualifications for performing such services. (Supreme Court of New Jersey, *Green v. Bittner*, 85 NJ 1, 1980, p. 12)

It is obvious that Judge Wilentz explicitly specified the measurability of these services by reference to the relevant markets for them. For advice, guidance, and counsel services, then, the closest market proxies are business advisers, therapists, or trained counselors. To this listing may be added other related professions such as marriage and family counselors, teachers, and social workers. For companionship services, the closest market proxy is practical nurses.

**Determining an Equivalent Market Wage**

*Companionship services*

For companionship services, New Jersey courts often accept use of the wages of paid companions. These workers may be hired from a nurses registry service for the purpose of having someone accompany them while shopping, help them obtain transportation, and generally be a companion to them. The Tinari Economics Group (TEG) regularly conducts telephone surveys of nursing care services in the geographic region of the plaintiff in order to estimate a local rate for the wages of paid companions.

Alternatively, your forensic economist may use data from national sources, in which case the wages of reasonably related occupations could be used as market proxies. Table 23A provides examples of the median wages of four such occupations.

Given the range of earnings values in Table 23A, from $8.54 for Personal and Home Care Aides to $17.57 for Licensed Practical Nurses, your economist will want to obtain a useful hourly figure. Calculating the mean of these figures is one way of doing this. This yields, in this case, an approximate hourly wage of $11.53 in 2006 dollars, which can be considered a reasonable estimate of the national replacement hourly cost of companionship services lost to family members as a result of a family member's death.

Two important issues must be considered when determining the market value of companionship services. First, for purposes of litigation, your forensic economist will typically attempt to value the replacement labor costs of lost services. From that perspective, what is relevant is not the annual wage of a comparable worker but the hourly wage to provide specified services for several hours per week. Therefore, the hourly charges for paid companions from,

for example, nursing registry service firms may be the most appropriate wage rate to use. Also, they quote rates for "paid companions" whereas national data do not provide a comparable usage figure.

Second, the difference between the range of wages nationwide provided in Table 23A and that of paid companions from nursing registry services in New Jersey (cited above) is very wide, with the New Jersey rate being nearly twice as high. Your forensic economist using these data would very likely want to adjust the values to reflect the market or region in which the family resides. The data source cited for Table 23A includes wage information by state, so some degree of tailoring is possible.

### Advice, Counsel, and Guidance Services

For advice, counsel, and guidance services, wages of the cited market proxies and reasonably-related occupations may be examined. Table 23B shows the results of a search completed by TEG.

The range of hourly wages is from $10.90 for residential advisors to $42.64 for business teachers. Once again, your economist will want to develop a useful hourly figure. Averaging the figures in the table will, in this case, generate an approximate hourly wage of $23.92 in 2006 dollars, which may be considered a reasonable estimate of the national replacement cost of advice and counsel services lost to family members as a result of a family member's death.

In his 1998 article, "Household Services: Toward a More Comprehensive View," Tinari notes

> ... that the occupations listed in the table do not include highly-compensated professionals such as psychiatrists, stock brokers or lawyers. The reasons are that these occupations a) require a very high level of education and training that would not typically be characteristic of average Americans, and b) provide highly specialized advice that would go beyond the type of advice and counsel that family members would typically provide one another.

One important question that typically arises is whether or not average market wages cited understate or overstate the hourly values of companionship and advice, guidance, and counsel services. The literature has noted that the market wage may overstate the value of similar home produced services because the market wage rate represents the value of specialized, "professional" labor services, the quality of which is likely higher than that of a husband or wife who provides similar but non-specialized services. A countervailing argument is that market-substitute labor is generally an inadequate replacement and only a rough proxy for the services provided by a husband or wife in the home.

In their 1988 study titled "Market Value of Household Production," Dulaney et al. concluded that

> ... the perceived quality of household output exceeds the quality of alternative market purchases for all types of output. The preference for household production is strongest in the case of childcare, suggesting that babysitting and other childcare services are regarded as poor substitutes for parental care (Dulaney, Ronald A., John H. Fitzgerald, Matthew S. Swenson and John H. Wicks, "Market Valuation of Household Production," *Journal of Forensic Economics,* 5(2), 1992, pp. 115-26).

While not resolving the problem in a definitive way, these results weigh the evidence in favor of the position that the market wage estimates developed above for both companionship services, and advice, guidance, and counsel services, very likely understate their value to households.

### Determining the Quantity of Hours

Until a reputable study is undertaken and its results published, your forensic economist must rely on indications found in scattered studies as well as his/her intuitive and experiential knowledge to develop reasonable, conservative estimates in any given litigated matter. With respect to both advice and companionship services, Table 23C gives *suggested quantities* for various family profiles as provided in Tinari's 1998 study, "Household Services: Toward a More Comprehensive Measure."

As an example of how these values were estimated, consider the first row of the table dealing with a husband and wife family unit. With respect to advice and counsel, it is assumed that discussions between the two about family matters, personal problems, business, house and work decisions, finances, and other matters affecting the two that require advice, guidance or counsel, total approximately one (1) hour per week. It may be reasonably assumed that such advice by a now deceased spouse would have been proffered in small increments during the week, depending on the actual lifestyle and living pattern of the couple. Factors influencing the number of hours of advice, guidance, and counsel services provided include gender, health, educational attainment, family living arrangements,

age, and labor force status of family members. Of course, detailed information about the family would serve to lend credence to the number of hours assumed by the forensic economist.

It should be emphasized that the hours assigned to advice, guidance, and counsel services should be conservative, especially in cases of claims for losses to children upon the death of a parent because there may be partial overlap with "childcare" services often included in published household services data sets.

**Valuing the Services**

To begin, your economist must convert 2006 wages given in Tables 23A and 23B into 2008 dollars. For the purpose of this exposition, an annual growth rate of 3% is applied resulting in 2008 estimated hourly wages of $12.23 for companionship services and $25.38 for advice, guidance, and counsel services. The next step is to combine these wage estimates with the suggested quantity of hours given in Table 23C to develop a series of annual estimates, expressed in 2008 dollars, of the value of companionship services and the value of advice, guidance, and counsel services for various types of wrongful death claims. These are presented in Table 23D.

## Table 23A: Hourly Median Wages of Companionship Related Occupations

Please see the Tables folder on the CD-ROM for this image.

## Table 23B: Hourly Median Wages of Advice-Related Occupations

Please see the Tables folder on the CD-ROM for this image.

## Table 23C: Suggested Hourly Quantities of Services

Please see the Tables folder on the CD-ROM for this image.

## Table 23D: Estimated and Suggested Annual Values of Services

Please see the Tables folder on the CD-ROM for this image.

## §650    MEASURING THE LOSS

Section 651 that follows discusses four possible methods that may be used to calculate the loss of household service value. The first, specific services replacement cost, is most often seen in economic reports, but the other three have merit and may be more appropriate in certain cases. Section 652 presents the most widely used study of the replacement cost method. It contains both average hours spent performing itemized household services and the cost of such services. Lastly, §653 covers various marital categories, such as married, divorced, separated, widowed, and never married.

### §651    The Four General Approaches to Measuring Household Production of Services

*You may find that your economist is using a different approach to measuring the value of household services than is the opposing economist. This should not be surprising as there are four general approaches that have been advanced in the studies made on the subject. While this section will not provide specific measurements under each approach, it does give you the underlying information needed to understand what each economist may be doing. The portion of this section that follows was written by Dr. Thomas R. Ireland, University of Missouri-St. Louis. Dr. Ireland has studied and published extensively on this topic.*

**Ireland Position on Measurement of Household Services by Secondary and Primary Household Nonmarket Workers**

Dr. Thomas R. Ireland

There are four general approaches that have been used by forensic economists to measure the value of household production: (1) Specific Services Replacement Cost; (2) General Replacement Cost; (3) Simple Opportunity Cost; and (4) Long Run Implied Opportunity Cost. The specific services replacement cost attempts to estimate the specific services being provided by a household worker in terms of time spent in each activity and to apply a set of different market wage proxies for the values of each service that is separately estimated. The general replacement cost approach attempts to estimate the total amount of time provided by a household worker and to value that time based on a single market based wage rate for a person able to provide all such services. The simple opportunity cost method is very similar to general replacement cost method, but the value of the time provided is valued on the basis of the market earnings rate that would have been currently available to the household worker, rather than the general wage that would need to be paid to the replacement worker. In practice, there would be almost no difference. Long term implied opportunity cost would ordinarily apply only to primary household workers, but not secondary household workers. An expert who used long term implied opportunity cost for primary household workers would ordinarily use simple opportunity cost for secondary household workers. A secondary household worker has no specialization in nonmarket human capital and provides services that must be less than or equal to the after tax value of his or her labor market (plus fringe benefits) wage or earnings rate.

A primary household worker is someone who has, in the human capital senses developed by Gary Becker (1992 Nobel Prize winner in economics), devoted herself to the development of important human capital skills for her special roles in household work. She is, in short, not an unskilled worker, but a worker with significant levels of family specific human capital skills that are involved in providing the special nonmarket services she provides to her family. She normally serves as the household manager, supervising other secondary household workers. She prepares budgets, maintains overall expenditure controls over other household members, has primary responsibilities for child care and elder care, and so forth. She may also provide important career consulting services for her spouse, which may include "volunteer work," where she may develop social contacts useful for her spouse's business. She may maintain full time employment in the labor market on a "mommy track" basis, may work part time in the labor market or be fully employed in nonmarket work for her family. The key element is that she has foregone the development of her full labor market potential, and thus is earning less than would have been possible with a fully focused labor market career. This means that if she had fully specialized in labor market human capital instead of nonmarket family-specific human capital, she would have been earning much more in the labor market than was the case at the time of her injury or death.

The long term implied opportunity cost projects the earnings of the decedent or injured primary nonmarket worker on the basis of her earnings if she had fully developed her labor market career, plus the value of a simple opportunity cost estimate of the nonmarket services that would have been provided by a career wife who was a secondary household worker. In other words, if the worker had not become a family specialist she would still have provided some nonmarket services on an unskilled basis. Her value to the family is equal to her labor market earnings plus her unskilled nonmarket services. Normally, a vocational expert is needed to project the woman's implied labor market earnings rate based on her hypothetical years of labor market career development at the time of her death or injury. For example, if a woman with a bachelor's degree from an accredited university was a full time homemaker at the time of her death and had been so for 15 years, a vocational expert would estimate her labor market earnings with her degree and 15 years of experience. The economist would then add the value of about 18 (University of Michigan survey estimate) hours of unskilled nonmarket service (simple opportunity cost method) to her labor market earnings estimate to obtain an estimate for the full value of her nonmarket services.

## §652    The Dollar Value of a Day

Much of the data used by forensic economists has been adapted from studies, surveys, and samples that were originally developed for other purposes, but were precisely what the economist needed to evaluate a loss. Such is the case in the most comprehensive studies to date on time spent in household work. Economists John Ward and Kurt Krueger, through their work as economic demographers at the firm Expectancy Data in Shawnee Mission, Kansas, (877) 326-3282, have combined data collected from two highly regarded sources into a study titled The Dollar Value of a Day.

The Environmental Protection Agency (EPA) commissioned a study called the National Human Activity Pattern Survey to collect data on the public's exposure to a wide range of pollutants. In analyzing exposure, the EPA required information on when, where, and how long people are in specific microenvironments and what activities they perform in those locations. The survey was conducted from September 17, 1992, through October 1, 1994, by the University of Maryland's Survey Research Center. The survey collected data on the time spent by 9,386 persons ages 0 to 94 in each of the 50 states and over all seven days of the week by using what surveyors call a time-diary study. From these detailed diaries, Expectancy Data has been able to isolate the time spent on household activities in hours per day in 23 categories.

Data for the wage replacement cost valuation are from the U.S. Department of Labor's Bureau of Labor Statistics Occupational Employment Statistics survey. The wages for the various occupations were weighted based on the time spent in various types of household work. Further data were found in the Current Population Survey (CPS) and were used by many economists.

Then, in the fall of 2004, a new study called the American Time Use Survey (ATUS) was released by the Department of Labor. The survey was conducted by the Census Bureau and sponsored by the Department of Labor. This is planned to be an ongoing and regularly updated study that seems to be superior to any of the studies mentioned above. Accordingly, Expectancy Data prepared a new version of Dollar Value of a Day based on the ATUS data.

Table 24 breaks down the categories into items such as food, cooking, and cleanup. For each category, it provides weekly hours, hourly dollar values, and the dollar value of a day for both males and females, and is also based on ATUS data. These examples are but many that are included in the full publication and early indications are that economists are already moving to the use of ATUS data and away from the traditional CPS and EPA data. The entire DVD publication is available at the address listed for Expectancy Data earlier in this section. Should you wish to obtain the original study results in addition to the DVD study, they are available on the Internet at: http://stats.bls.gov/news.release/atus.toc.htm.

Doctors Ward and Krueger have not created something new from the data. Rather, they have taken the original data and converted it into a format that is far more user friendly for the economist, attorneys, and jurors than is the formal study found on the Internet.

## Table 24: Dollar Value Per Day

Please see the Tables folder on the CD-ROM for this image.

### §653    Hours of Household Work Based on Marital Status

Studies using different data sets continue to appear in the literature. One such study is based on the National Survey of Families and Households and consists of a sample of over 13,000 households with a follow-up study reinterviewing over 10,000 of those same households about five years later. The authors are Joni Hersch and Leslie S. Stratton. The study is "Housework and Wages" and is available as Harvard Discussion Paper 300 dated October, 2000. It can be found under the Harvard John M. Olin Discussion Paper Series on their Internet site at http://www.law.harvard.edu/programs/olin_center. This paper may also be found using the citation: Hersch, Joni and Leslie S. Stratton, "Housework and Wages." *Journal of Human Resources*, Vol. 37, 82002. Reprinted by permission of the University of Wisconsin Press.

This study covers the time spent in household work for both men and women in three marital categories: (1) Married, (2) Divorced, Separated, Widowed, and (3) Never Married. It further breaks down the time devoted to housework into nine categories as shown in Table 24A. You will immediately note that there is no separate category for "child care." There was no specific question regarding time spent in child care in the survey, but one assumption may be that the respondents imbedded child care time within the nine categories about which they were asked. Additionally, some child care work may occur simultaneously with some of the nine categories. For example, a mother may be babysitting while at the same time preparing a meal, doing the laundry, or cleaning. This would be an overlap in work being done, but would not change the total number of hours devoted to the household and family. The results of the survey are given in hours of home production per week. Your economist could use these hourly numbers and either use an overall wage rate for all categories or attempt to price each activity separately.

**Table 24A: Household Work by Marital Status**

Please see the Tables folder on the CD-ROM for this image.